A03A1582. MEADOWS v. THE STATE.
A03A1583. THOMAS v. THE STATE.
(590 SE2d 173)

SMITH, Chief Judge.

Allen Lewayne Meadows and Renardo Thomas were convicted of the offenses of burglary, aggravated assault, and possession of a firearm during the commission of a crime. Following the denial of their motions for new trial, they appeal. In Case No. A03A1582, we affirm the trial court's denial of Meadows's motion for new trial. In Case No. A03A1583, however, we conclude that the trial court should have granted the motion for new trial filed by Thomas.

Construed in favor of the jury's verdict, the State presented evidence that the victim and his wife lived in an apartment located at 923 Renaissance Way in Rockdale County. They were sitting inside their living room at approximately 3:20 a.m. on February 11, 2002, when their front door suddenly burst open. The victim saw two men outside the apartment, one of whom walked two or three steps inside his doorway and shot once or twice. The victim returned fire with his own gun, shooting four or five times, and the two assailants ran away. The victim could not identify either assailant and stated only that the man who shot at him was wearing a hooded sweater. Earlier in the evening, because a break-in had occurred in his apartment approximately two weeks before this incident, the victim had placed a chair weighted with dumbbells against the door. The victim had also activated his burglar alarm, but the alarm did not sound when the door burst open. Evidence was presented showing that the alarm

functioned through use of telephone lines and that the phone lines to the entire apartment building had been disabled.

A neighbor testified that the sound of gunfire awakened him at approximately 3:00 a.m. on February 11. He had a view of the "[t]he breeze way area where the two gentlemen ran out of," and he saw two men run into the parking lot. One man left the scene in a large sport utility vehicle, and the other left in a small red pickup truck. Another resident, an off-duty DeKalb County police officer who lived in the complex and had a "panoramic view" of the area, also was awakened by gunshots. He saw a black man running away from Building 900. The man got into a small red truck, which temporarily became stuck in some fencing. The truck eventually left the scene, followed closely by a sport utility vehicle.

Over objection, Greg Cipriano, a detective with the DeKalb County Police Department, testified about the substance of a statement given to him by Meadows. He received a call early in the morning of February 11 concerning two shooting victims who were being treated at a hospital nearby. He talked with Meadows at the hospital and asked him how he incurred his injury. Meadows told Cipriano that he and Thomas were at a nightclub in DeKalb County and "met up with a third male." Meadows, Thomas, and the unnamed man left the nightclub in Meadows's pickup truck. At the unidentified man's direction, Meadows left DeKalb County and stopped in "an unknown area." Meadows and Thomas left the truck momentarily to relieve themselves, and when they returned, the third man was gone, along with Meadows's handgun. "Somehow they were directed to a house in the neighborhood where this third person apparently went to." Meadows explained to Cipriano that they forced entry into the house, the homeowner opened fire, and they received gunshot wounds and then used the truck to get themselves to the hospital. Based on information he received from hospital personnel, Cipriano located the truck in which Meadows and Thomas had arrived, a red Ford Ranger.

Tucker Vanderbunt, a detective with the City of Conyers Police Department, arrived at the victim's home shortly after he received a call at 3:30 a.m. A .40 caliber handgun was found on the rear steps leading to the victim's apartment, and a .40 caliber casing and projectile were found inside the living room of the apartment. In addition, two .40 caliber shell casings were found inside Meadows's truck. The victim turned his weapon, a .357 revolver, over to the police. Later that day, Vanderbunt went to the hospital, after learning that two patients there had reported gunshot wounds. He examined the Ford Ranger pickup truck in which Meadows and Thomas had arrived. He observed bloodstains and several pairs of gloves in the truck bed. The next day, he returned to the hospital and talked with Meadows. Although Meadows was on pain medication, he was coherent and

appeared to understand what Vanderbunt said to him. Their conversation was recorded, and the tape was played for the jury, over objection by both defendants. Vanderbunt also talked with Thomas, and their conversation was likewise recorded and played for the jury, over objection. Typed transcripts of the conversations were provided for the jury. According to Vanderbunt, Thomas appeared to be oriented to time and space and was willing to speak with him. Vanderbunt testified that although Thomas appeared to "be in a little pain," he did not "appear to be under the influence" of medication.[1]

According to the transcription included in the record, the substance of Meadows's statement to Vanderbunt follows: Meadows and "Nardo" were visiting a nightclub, and they gave an unidentified man a ride in Meadows's red Ford Ranger. They stopped at a gated apartment complex and gained entry when the other man "pressed in a code." Meadows and Thomas exited the truck to use the bathroom. When Meadows returned, his .40 caliber gun was missing, along with the unidentified man. He and "Nardo" followed the man into one of the apartment buildings and heard a door close. Meadows knocked on the door and stated, "Hey partner, give me [the] gun back." He did not receive an answer, so he struck the door with his shoulder, knocked it open, and was shot. He was wearing a gray hooded sweater. He and "Nardo" both received gunshot wounds, and they left the scene in Meadows's truck.

Approximately midway through his interview with Meadows, Vanderbunt took a break and talked with Thomas but then returned and completed the conversation with Meadows. According to the transcript of the taped interview, Vanderbunt told Meadows that he was not under arrest but that he needed "to read you your rights because I am getting a couple of conflicting statements." Vanderbunt read Meadows his *Miranda* rights, after which Meadows stated that he would "talk to you." Meadows then stated that when he attempted to hit the door, "[t]here was something at the door cause it stopped. And then there was a muzzle flash." He explained that he used the gloves found in his truck for his auto detail business.

According to the transcription of Vanderbunt's interview with Thomas, Thomas stated that he and "Al" were taking a girl home from a club and stopped at an apartment complex, where the girl used her key card to gain entry. Thomas thought someone was following them. After the vehicle stopped, "Al" and the girl began walking

---

[1] The audiotapes of Vanderbunt's interviews with Meadows and Thomas are not part of the appellate record. The transcripts provided to the jury were transmitted to this court, however, by the Clerk of the Superior Court of Rockdale County. Although these transcripts were not tendered as exhibits or admitted into evidence, the State in its appellate brief recites that it "has no objection to the use of those transcripts in lieu of the actual audiotapes."

toward the apartment building, he exited the truck in order to use the bathroom, and "somebody started shooting." He was shot. He saw "some dudes running toward a truck" that appeared to be a sport utility vehicle. Meadows drove him to the hospital. During Meadows's interview, he claimed that Thomas might have been hallucinating about the presence of a girl.

Blood samples were taken from Meadows and Thomas at the hospital, and blood samples were taken from the sidewalk outside the victim's apartment and from the truck bed. An expert witness who compared all of the samples testified that those taken from the sidewalk and the truck bed matched "the blood of Renardo Thomas, either him or his identical twin."

## Case No. A03A1582

1. Meadows argues that his Sixth Amendment right of confrontation was violated when the trial court erroneously admitted his codefendant's statement. We find no reversible error with respect to the admission of Thomas's statement.

Thomas's statement implicated Meadows, as it placed him at the crime scene. But Meadows's own statement, which was admissible against him at trial, also placed him at the scene. More importantly, Meadows admitted that he forcefully entered an apartment. In addition, .40 caliber casings were found both in his truck and inside the apartment. Any incriminating information contained in Thomas's statement was merely cumulative of properly admitted testimony. Consequently, even assuming that Thomas's statement was erroneously admitted, Meadows cannot show that he was harmed by its admission. See *Copeland v. State*, 266 Ga. 664, 666-667 (3) (b) (469 SE2d 672) (1996).

2. Meadows argues that the evidence was insufficient to convict him of aggravated assault against the other victim, as charged in the indictment. He contends that "[t]he State failed to prove beyond a reasonable doubt that [the wife] was aware of the alleged deadly weapon, was afraid for her own safety, or was actually present during the assault." Even though the wife did not testify, the husband testified that he and his wife, who had the same name as the victim listed in the indictment, were sitting inside their living room when a man burst into their apartment and fired at least two shots. He also stated that his wife "was so scared. I think she was like, she was dizzy, you know, like crying, you know." Given this evidence, we cannot conclude that the wife was unaware of the gun or that she was unafraid.

3. Contrary to Meadows's argument, the trial court did not err in its instructions concerning burglary. Among other things, the court

charged the jury that a person commits burglary when, without authority, he or she enters a building or dwelling with the intent to commit a felony and that "an unlawful entry occur[s] when a person breaks the plane of the structure with the intent to steal or with the intent to commit a felony therein." These were accurate statements of Georgia law. OCGA § 16-7-1 (a). See *Hewatt v. State*, 216 Ga. App. 550, 551 (455 SE2d 104) (1995) (defendant found "breaking the plane" when he attempted to crawl in window); *Mullinnix v. State*, 177 Ga. App. 168, 169 (338 SE2d 752) (1985) (person "breaks the plane" of structure when he or she reaches through hole in door to remove alarm device with intent to steal).

4. Meadows contends he was denied effective assistance of counsel. To prevail on this claim, he must show that his trial counsel's performance was deficient and that but for this deficiency, the outcome of his trial would have been different. *Sutton v. State*, 261 Ga. App. 860, 862-863 (2) (a) (583 SE2d 897) (2003).

(a) Meadows first contends that trial counsel was ineffective for failing "to challenge the competency of" the husband's testimony and for failing to object to his testifying without the use of an interpreter. It appears to be undisputed that the husband did not speak English as a primary language. But this status alone did not render questionable his competency to testify without the assistance of an interpreter. On the contrary, our review of the transcript shows that the husband appeared to understand the questions asked by the State and by defense counsel, and he gave appropriate answers to the questions. He appeared to be fairly fluent in his use of the English language. As argued by the State in its appellate brief, Meadows "points to nothing in the record that would create even a hint of a lack of competence" and has not demonstrated "any specific way in which [the victim] failed to be understood by the jury or Mr. Meadows." Meadows's allegation of ineffectiveness on this ground is "rank speculation," *Sutton*, supra at 864, and provides no basis for reversal.

(b) Meadows also argues that trial counsel was ineffective because he failed to interview the victim's wife and brother, who were present during the incident. Trial counsel testified that he did not interview these witnesses because they did not speak English. Meadows argues that his trial counsel should have sought funds to hire an interpreter or should have found some other method of interviewing the non-English-speaking witnesses. He has not, however, even hinted as to what the testimony of either of these witnesses might have been if they had been interviewed. As argued by the State, his "post-conviction counsel had at his disposal the same means as trial counsel to interview the other [victims] and present evidence to the trial court to show how his case was prejudiced by

trial counsel's alleged failures." Because Meadows made no proffer of the information that interviews with the two witnesses might have provided, it is impossible for him to show "a reasonable probability [that] the results of the proceedings would have been different." (Citations and footnotes omitted.) *Morgan v. State*, 246 Ga. App. 887 (542 SE2d 644) (2000). See also *Sutton*, supra at 865 (2) (c); *Baitey v. State*, 275 Ga. 681, 683 (571 SE2d 733) (2002).

(c) We similarly reject Meadows's argument that trial counsel was ineffective for failure to subpoena a particular witness who would contradict the victim's testimony that his assailants fired shots into the apartment. This witness did not testify during Meadows's motion for new trial, and the record is bereft of any evidence showing that this witness's testimony would have benefitted Meadows. And as argued by the State, "[t]rial counsel more than adequately . . . used his skills as an oral advocate to discredit [the victim's] testimony . . . with the physical evidence in the record."

(d) Finally, Meadows contends he was denied effective assistance because trial counsel failed to file a motion to sever. He argues that the trials should have been severed because he and Thomas made statements in which they implicated one another and that the jury was erroneously allowed to consider Thomas's statement against him. But even if Thomas's statement was erroneously admitted any error was harmless, in light of Meadows's own statement and other properly admitted evidence. Meadows has not shown that any deficiency caused by failure to file a motion to sever affected the outcome of the case, and he therefore has not met his burden of showing ineffective assistance of counsel.

## Case No. A03A1583

5. Thomas argues that the trial court violated his Sixth Amendment right to confrontation by allowing the State to introduce Meadows's statement, when Meadows did not testify and was not available for cross-examination.

Thomas correctly argues that under *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968),

> a defendant's Sixth Amendment right of confrontation is violated when: (a) co-defendants are tried jointly; (b) one co-defendant's statement is used to implicate the other co-defendant in the crime; and (c) the co-defendant who made the implicating statement employs his Fifth Amendment right not to testify and thus does not take the stand to face cross-examination about the statement.

(Footnote omitted.) *Boone v. State*, 250 Ga. App. 133, 135-136 (2) (549

SE2d 713) (2001). Meadows and Thomas were tried jointly, and neither testified. And contrary to the State's argument, Meadows's statement implicated Thomas in the crime. Meadows stated that they forced their way into the victim's apartment, and as Thomas argues, Meadows called "into question the veracity of" Thomas's statement. Meadows could not be cross-examined about the statement, the statement was not fully redacted to remove reference to Thomas, and "the statement had no independent basis for admission." *York v. State*, 242 Ga. App. 281, 285 (2) (a) (528 SE2d 823) (2000). A *Bruton* violation therefore occurred.

We cannot agree with the State's contention that Meadows's statement was admissible as a declaration of a co-conspirator during the concealment phase of a conspiracy, under OCGA § 24-3-5. In *Crowder v. State*, 237 Ga. 141 (227 SE2d 230) (1976), the Supreme Court of Georgia broadly held that

> a statement made to police by a conspirator, whether inculpatory or exculpatory as to the declarant, which statement incriminates the other conspirator as a party to the crime, also constitutes termination of the conspiracy. Thus, such statement by a conspirator is not made during the pendency of the criminal project and is not admissible under [OCGA § 24-3-5].

Id. at 153. Meadows's statement was made to the police, and it implicated Thomas. Under *Crowder*, the conspiracy had ended, and Meadows's statement was admissible only against himself.

Having concluded that a *Bruton* violation occurred, we must address the issue of whether the violation harmed Thomas. Contrary to Thomas's contention, we conclude that the properly admitted evidence was sufficient to convict him under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The circumstantial evidence was not overwhelming, however. On one hand, there is no question that Thomas was present at the apartment complex; DNA analysis confirmed that the blood on the sidewalk matched the blood taken from Thomas at the hospital. But the only evidence directly identifying Thomas as one of the men at the victim's door was Meadows's improperly admitted statement. Under these circumstances, we conclude that a high probability exists that the introduction of Meadows's statement influenced the jury's verdict. We therefore reverse the judgment of conviction against Thomas and remand this case for a new trial. See generally *Myers v. State*, 256 Ga. App. 135, 139-140 (1) (567 SE2d 742) (2002).

6. Because it is likely to recur on retrial, we address Thomas's contention that he was in custody for *Miranda* purposes at the time

he gave his statement. It is undisputed that Vanderbunt did not read Thomas his *Miranda* rights before interviewing him at the hospital. Thomas argues that he was virtually in custody because he was hospitalized and was a suspect at the time of the interview.

*Miranda* warnings are required when a person has been "taken into custody or otherwise deprived of his freedom of action in some significant way." (Citation and footnote omitted.) *Max v. State,* 249 Ga. App. 719, 721 (549 SE2d 510) (2001). In deciding whether a defendant was in custody, "a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Footnote omitted.) Id. We will disturb the trial court's determination on this issue only if it is clearly erroneous. Id.

Here, Vanderbunt testified that although Thomas was in the hospital when he interviewed him and had been "struck in the upper leg shattering his large bone," he did not appear to be impaired by narcotic drugs and was coherent. He was willing to speak with Vanderbunt, and Vanderbunt neither threatened nor induced Thomas to give a statement. And even though Thomas may have been a suspect at the time of the interrogation, this factor alone is not determinative.

> *Miranda* warnings are required only when one's freedom has been restricted so as to render [him or] her in custody of the State. However, the determination of whether one is in custody depends upon the objective circumstances attending the particular interrogation. . . . In determining whether *Miranda* warnings were required in a given situation, it is not relevant that investigators (1) might have focused their suspicions upon the person being questioned, or (2) have already decided that they will take the person into custody and charge them with an offense, so long as that individual is not in custody.

(Footnotes omitted.) *Hardin v. State,* 269 Ga. 1, 2-3 (2) (494 SE2d 647) (1998). Thomas's movement was restrained not by Vanderbunt, but by virtue of Thomas's injury. Undisputed evidence was presented that despite this injury, Thomas was coherent and willing to talk with Vanderbunt and was not coerced. Some evidence therefore existed on which the trial court could have concluded that Thomas's freedom was not restrained to the degree associated with a formal arrest.

*Judgment affirmed in Case No. A03A1582. Judgment reversed in Case No. A03A1583. Ruffin, P. J., and Miller, J., concur.*

Decided November 14, 2003.

Clark & Towne, Wystan B. Getz, for appellant (case no. A03A1582).

Carnesale & Deland, Charles C. Flinn, for appellant (case no. A03A1583).

Richard R. Read, District Attorney, Roberta A. Earnhardt, Assistant District Attorney, for appellee.