A06A0113. BUNKLEY v. THE STATE.
A06A0114. SANDERS v. THE STATE.
(629 SE2d 112)

MIKELL, Judge.

Earnest Richard Bunkley III, and Quentelus Sanders were jointly indicted, tried, and convicted of the following offenses: burglary, armed robbery, aggravated assault (two counts), theft by taking, and possession of a firearm in the commission of a crime. Bunkley, who was 13 years old when he committed the crimes, was tried as an adult. Taking into account Bunkley's four prior adjudications of delinquency, the court sentenced him to life in prison for the armed robbery; fifteen years to serve consecutively for the first aggravated assault (Count 3); fifteen years to run concurrently for the burglary, theft by taking, and the second aggravated assault (Count 4); and five years to serve consecutively for the firearm offense. Sanders, who was 16 years old at the time of the crimes and also had a juvenile record, received an identical sentence. A third defendant, Willie Alfred Prather, Jr., who was 22 years old at the time of trial, pleaded guilty prior to trial and testified against his co-defendants, although he received no leniency in sentencing in exchange for his testimony. Following the grant of an out-of-time appeal, Bunkley argues that the trial court erred in denying his motion for a new trial on the ground of ineffective assistance of counsel. On appeal from the denial of his motion for new trial, Sanders argues that the trial court erred in refusing to merge certain offenses. We affirm the judgments in both cases.

Although neither appellant raises the general grounds, a review of the evidence adduced at trial is essential to the disposition of these appeals. Viewed in the light most favorable to the verdict, the evidence shows that on May 18, 1999, Jennie Mae Duncan, who was 78 years old and lived alone, heard a knock at her front door. Using her walker, Mrs. Duncan proceeded to the door and opened it. She saw three young people standing on her front porch. The eldest, later identified as Prather, asked Mrs. Duncan if she had any work for the boys to do. She testified that she said "no" and told them to leave. They

did not. Instead, they forced their way into the front room where Mrs. Duncan conducts Bible studies. Prather, whom Mrs. Duncan called "the big one," hit her so hard over the head that blood started pouring all over her face.

Mrs. Duncan testified that after Prather knocked her down, he began to search the house. Then the two "little ones," whom she identified at trial as Sanders and Bunkley, beat her "everywhere" on her head, face, and body with her walker. Prather found her purse, which contained $11 and her car keys. He took them both, and all three defendants left. Mrs. Duncan then pressed the medic alert button that she wore around her neck and crawled to the bedroom to use the telephone.

Her neighbor, Esser Mason, responded. Mrs. Mason testified that when she entered the victim's home, the victim was on the floor, and her "head was bloody, her face was bloody, and her clothes were bloody. And this foot . . . was full of blood." Mrs. Mason explained that the victim had on white socks and that one of her socks was bloody. Mrs. Mason also testified that the victim told her that "three boys" had beaten her up.

Taylor County Sheriff Jim Wainwright arrived shortly after Mrs. Mason. He testified that he saw a lot of blood on the floor and a trail of blood leading to the victim. He helped set up her wheelchair so as to tend her wounds. According to Wainwright, the "whole top of her head" was bleeding. Paramedics soon arrived to transport Mrs. Duncan to the hospital, where she received stitches to close her head wound. The victim testified that she was hospitalized for about a week and still had knots on her head at the time of trial, on February 28, 2000.

A sheriff's deputy who had been dispatched to the scene discovered that Mrs. Duncan's 1997 Crown Victoria was missing, and he issued a BOLO (be on the lookout) for the vehicle. Corporal Wayne Fallin of the Thomaston Police Department testified that the car was spotted that evening in Thomaston. Fallin assisted a patrolman in stopping the vehicle, but the patrolman, who did not testify, obtained the occupants' identities. Fallin did not identify the defendants at trial. Fallin did testify that a gun was discovered under the front passenger seat. The gun was loaded with one round, and a magazine was discovered in the glove compartment.

Prather admitted that he asked the victim for work and that he "busted" into her house. Prather testified that he hit Mrs. Duncan on the head with a pistol with such force that the "whole gun fell apart." Prather further testified that at the time of the incident, he had been living with Sanders, and that Sanders was carrying the gun when they left the house that morning. Later, they met up with Bunkley. According to Prather, Sanders told him about "this old lady who had

a lot of money and stuff." Prather also testified that after entering the victim's house, he and Bunkley went into the back and took her keys and money. Prather stated that he drove the car and that they made some stops. He also testified that Bunkley "stole some tapes," but the court sustained counsel's objection to that testimony. Prather further testified that he struck the victim and that Bunkley did not. Finally, Prather's testimony established that all three perpetrators were apprehended in the victim's vehicle.

## Case No. A06A0113

1. Neither Bunkley nor Sanders testified at trial, and both of their custodial statements were admitted into evidence without objection. Bunkley argues that trial counsel rendered ineffective assistance by failing to object to the admission of these statements. We discern no clear error by the trial court in denying Bunkley's motion for new trial on this ground.

> In order to establish ineffectiveness of trial counsel, appellant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case. In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo.[1]

(a) First, Bunkley contends that counsel was ineffective in failing to move to exclude Sanders's statement pursuant to *Bruton v. United States*.[2] Under *Bruton*,

> a defendant's constitutional right of confrontation is violated when: (a) co-defendants are tried jointly; (b) one co-defendant's statement is used to implicate the other co-defendant in the crime; and (c) the co-defendant who made the implicating statement employs his Fifth Amendment

---

[1] (Citations and punctuation omitted.) *Williams v. State*, 277 Ga. 853, 857 (6) (596 SE2d 597) (2004).

[2] 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

right not to testify and thus does not take the stand to face cross-examination about the statement.[3]

In his statement, Sanders admitted his and Bunkley's presence at Mrs. Duncan's house but essentially blamed Prather for the crimes. Sanders did claim that Bunkley first mentioned "that Mrs. Duncan stayed by herself and that somebody drove for her." Sanders then claimed that he followed Prather and Bunkley to the victim's house; that Prather knocked on her door while he and Bunkley stood in the yard; that when the victim did not answer, Bunkley walked to her vehicle to see if the doors were open; that the victim opened the door to her home after Prather gave her a false name; that Prather asked the victim if she needed any yard work done and when she said no, Sanders began to walk away from the house; that he heard a loud "lick" and when he turned around, he could only see Bunkley, who was hiding on the porch; that Sanders then walked into the house and saw six bullets and the magazine clip for the gun lying on the floor; that the victim was on the floor; that all three perpetrators went into the back room of the house, where Prather and Bunkley rifled through the victim's purse; that Sanders returned to the front room, where the victim asked him for help; that he kicked the walker over to her and then ran out of the house; that once Prather and Bunkley came outside, Prather threw the victim's car keys to Sanders, who tossed them to Bunkley; that Bunkley started the car, but Prather told him to move over and Prather drove; that Sanders was in the back seat; that they eventually went to Wal-Mart, where Bunkley stole three cassette tapes; that they were stopped by the police when they were leaving Wal-Mart; and that the gun which came apart belonged to Prather, although Sanders had permission to use it.

Bunkley's trial counsel testified at the hearing on the motion for new trial that he had received Sanders's statement in discovery and had weighed the potential harm to Bunkley against the potential benefit in deciding not to object to its admission into evidence. Counsel explained that his trial strategy was to blame Prather for the crimes, and that allowing into evidence Sanders's statement, which implicated Prather, fit in with that strategy. "[S]trategic choices made after thorough investigation are virtually unchallengeable."[4] "Trial counsel's decision not to seek . . . exclusion under *Bruton* was clearly

---

[3] (Citations and punctuation omitted.) *Bennett v. State*, 266 Ga. App. 502, 505 (4) (a) (597 SE2d 565) (2004).

[4] (Citations and punctuation omitted.) *Stephens v. State*, 265 Ga. 120, 122 (2) (453 SE2d 443) (1995).

a matter of trial strategy. Such a strategic choice, made after thoughtful consideration, cannot support a claim of ineffective assistance of counsel."[5] "With the benefit of hindsight, it would appear that this strategy may have backfired. But that is not to say that it was ineffective as a matter of law."[6] Accordingly, Bunkley has failed to sustain his burden of proving that counsel was deficient by failing to move to exclude Sanders's statement.

Moreover, even if counsel's performance had been deficient, Bunkley has not shown prejudice. Under the prejudice prong of the two-part ineffective assistance test, Bunkley bears the burden of showing that "but for the deficient performance, there was a reasonable likelihood that the outcome of the trial would have been different."[7] In the case at bar, the evidence of Bunkley's guilt, including the testimony of the victim and Prather, was overwhelming. "If the evidence of guilt (excluding the statement of the co-defendant) is overwhelming, then any violation of *Bruton* is harmless beyond a reasonable doubt and the conviction must stand."[8] Furthermore, the incriminating portions of Sanders's statement were merely cumulative of testimony given by Prather.[9] There was no error in denying Bunkley's motion for new trial on this ground.

(b) Bunkley next argues that counsel was ineffective for failing to request a *Jackson-Denno* hearing to challenge the voluntariness of his custodial statement. At the time he made the statement, Bunkley was 13 years old and had completed the fourth grade. Although appellate counsel asserts that Bunkley had an IQ of 57, no such report was admitted into evidence. Rather, a court-ordered mental evaluation that was read into the record during sentencing revealed that "[h]is ability to concentrate . . . was quite good and his level of intellectual functioning appeared to be at least in the low average range of intelligence."

In any event, Bunkley has not demonstrated that trial counsel was deficient for failing to seek suppression of his custodial statement because he "has failed to provide a meritorious basis to contest [its] admission."[10] At the hearing on the motion for new trial, counsel testified that, in his opinion, there was never any issue that Bunkley, who signed a waiver of rights form that was witnessed by his mother,

---

[5] (Citation omitted.) *Smith v. State*, 269 Ga. App. 133, 143 (4) (d) (603 SE2d 445) (2004).

[6] (Citation, punctuation and footnote omitted.) *Vincent v. State*, 276 Ga. App. 415, 417 (2) (623 SE2d 255) (2005).

[7] (Citation omitted.) *Pittman v. State*, 274 Ga. 260, 264 (5) (553 SE2d 616) (2001).

[8] (Citation omitted.) *Bennett*, supra at 506 (4) (b).

[9] See *Polite v. State*, 273 Ga. App. 235, 239 (3) (614 SE2d 849) (2005); *Meadows v. State*, 264 Ga. App. 160, 163 (1) (590 SE2d 173) (2003).

[10] *Byrd v. State*, 274 Ga. 58, 60 (2) (548 SE2d 2) (2001).

did not understand his rights. Trial counsel had an extensive discussion with Bunkley concerning the statement, and counsel had previously represented Bunkley. Based on his experience with Bunkley and discussions with him, counsel did not believe that a basis existed for suppressing the statement.

> The issue is whether there was a knowing and intelligent waiver by the juvenile of his constitutional rights in making the incriminating statement, assessed under the totality of the circumstances as set forth in *State v. McBride*, 261 Ga. 60, 63[-64] (2) (b) (401 SE2d 484) (1991) and *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976). [Cit.] Trial counsel determined that [Bunkley's] statement was freely and voluntarily given, even in light of [his] age and the rigorous standards for juveniles outlined in *McBride* and *Riley*. And [Bunkley] has failed to show otherwise.[11]

Furthermore, trial counsel testified that he made a strategic decision not to object when Georgia Bureau of Investigation special agent Chris Hosey testified that Bunkley essentially gave him three different statements because counsel felt that changing statements was typical thirteen-year-old behavior, and he was trying to encourage the jury to assess blame in proportion to age. As noted above, carefully considered strategic decisions cannot support a claim of ineffective assistance of counsel.[12] It follows that the trial court did not err in denying Bunkley's motion for new trial.

*Case No. A06A0114*

2. In his first enumeration of error, Sanders argues that his conviction of aggravated assault, as alleged in Count 3 of the indictment, merges as a matter of fact with his conviction on Count 2, armed robbery, and that the trial court should have sentenced him only for the armed robbery. We disagree. "[A]ggravated assault is not a lesser included offense of armed robbery as a matter of law, and the two offenses rarely merge as a matter of fact."[13] In the case sub judice, the indictment charged that the defendants committed armed robbery, when, with the intent to commit theft, they took the victim's money and car keys "from the immediate presence of Jennie Mae Duncan, by use of an offensive weapon, to wit: a pistol." Count 3

---

[11] Id.

[12] *Smith*, supra.

[13] (Citations omitted.) *Lowery v. State*, 209 Ga. App. 5, 8 (4) (432 SE2d 576) (1993). Accord *Taylor v. State*, 275 Ga. 461, 462 (1) (569 SE2d 520) (2002).

charged the defendants with making an unlawful assault "upon the person of Jennie Mae Duncan, a person 65 years or older, with a deadly weapon, to wit: a pistol, by beating said Jennie Mae Duncan with said pistol." "Offenses merge as a matter of fact pursuant to OCGA § 16-1-6 (1) if one of them is established by proof of the same or less than all the facts required to prove the other."[14] As was held in *Evans v. State*,[15] which involved a shooting followed by an armed robbery, we find that the aggravated assault was not included within the armed robbery as a matter of fact. In *Evans* we reasoned:

> The crime of aggravated assault was completed as a matter of fact before she [(defendant)] robbed the victim. Had she left after she shot him, she would be guilty only of aggravated assault. But, having used the weapon to bodily harm the victim, she also used it to effect a theft. The first crime required only a general intent she intended to shoot, that is, to do the act. The latter required a different intent, the specific intent to commit a theft; it was coupled with the use of the weapon for the purpose of getting the money out of the victim's hand.[16]

Here, too, the evidence that the victim was beaten over the head with a pistol showed a completed aggravated assault prior to the armed robbery. In other words, the pistol was used to effect bodily harm as well as to effect a theft. "As separate facts were used to prove each crime, the trial court did not err by refusing to merge the offenses."[17]

3. Sanders next argues that his conviction of aggravated assault, as alleged in Count 4 of the indictment, merges as a matter of fact with his armed robbery conviction. Count 4 charged the defendants with the offense of aggravated assault by beating the victim with "a walker, which when used offensively against another person, is likely to result in serious bodily injury." Clearly, aggravated assault committed with a walker does not merge with armed robbery effectuated by use of a pistol because the two offenses involve proof of different facts.[18] Moreover, the victim testified that she was beaten over the head with a pistol and then beaten with her walker. The jury was

---

[14] (Citation and punctuation omitted.) *Head v. State*, 202 Ga. App. 209, 210 (2) (413 SE2d 533) (1991).

[15] 173 Ga. App. 655 (327 SE2d 784) (1985).

[16] Id. at 657 (2). Compare *King v. State*, 241 Ga. App. 894, 895 (1) (528 SE2d 535) (2000) (only violence employed against the victim was that which was used to effectuate the theft); *Head*, supra (only aggravated assault shown was that by which commission of armed robbery was effectuated).

[17] *Blocker v. State*, 265 Ga. App. 846, 848 (2) (a) (595 SE2d 654) (2004).

[18] See id.

authorized to conclude from this testimony "that at least a portion of this violence was gratuitous and unconnected with the theft of the victim's money [and car keys]. Accordingly, we cannot accept the contention either that the one offense was included in the other or that both offenses were established by the same conduct."[19]

4. Finally, Sanders asserts that his conviction of possession of a firearm in the commission of a crime under OCGA § 16-11-106 merges with his convictions of armed robbery and aggravated assault with a pistol. This enumeration fails.

> As a matter of law, possession of a firearm during the commission of an aggravated assault does not merge with armed robbery. There is express legislative intent to impose double punishment for conduct which violates both OCGA § 16-11-106 and other felony statutes. OCGA § 16-11-106 (e) states that any crime committed in violation of subsections (b) and (c) of this Code section shall be considered a separate offense from the offense of possession of a firearm during the commission of any said crimes. The crimes encompassed by the broad language of OCGA § 16-11-106 (b) include offenses such as aggravated assault and armed robbery.[20]

*Judgments affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED MARCH 24, 2006.

*William J. Mason*, for appellant (case no. A06A0113).
*Thomas M. Flournoy III*, for appellant (case no. A06A0114).
*J. Gray Conger, District Attorney, Mark C. Post, Assistant District Attorney*, for appellee.

---

[19] (Citations omitted.) *Coaxum v. State*, 146 Ga. App. 370, 371 (3) (246 SE2d 403) (1978).
[20] (Punctuation and footnote omitted.) *Blocker*, supra at 848-849 (2) (b).