## A11A1456. LAYE v. THE STATE.
(720 SE2d 233)

ADAMS, Judge.

Randall Laye appeals his conviction for armed robbery arising out of an incident in Carrollton that led the State to charge nine individuals with murder, armed robbery, aggravated assault, cruelty to children, and other crimes. Laye was tried with co-defendant Chade Ackey, and, although both were charged with 17 crimes, Laye was convicted only of armed robbery (and sentenced to life), and Ackey was acquitted on all counts. The State's primary evidence inculpating Laye came from Christopher Coleman, the only person who pled guilty and agreed to testify against Laye and Ackey.

On appeal, Laye enumerates several errors concerning evidence of corroboration: that the corroborative evidence was insufficient; that the court erred by failing to give a limiting instruction regarding a custodial statement by co-defendant Ackey that implicated Laye; that, for the same reasons, the court erred by denying Laye's motion to sever his trial from Ackey's; and that trial counsel was ineffective by failing to request a limiting instruction regarding Ackey's statement. One other alleged error will be addressed, as well.

Because the main issue concerns corroboration of Coleman's testimony, we will begin there. Coleman pled guilty to murder, armed robbery, multiple counts of aggravated assault, multiple counts of cruelty to children, and possession of a firearm by a convicted felon; he is serving life plus ten years. He testified to the following: He was nineteen years old in July 2006, and, although he had been in Carrollton for only about five weeks, he had made friends with several young men there, including LaBryan Lytle, Varion "Snoopy" Shell, Arlandra Deonte "Red" Holland, and Aerius "P" Potts. On the night of July 19, Coleman arranged to borrow a white Neon car from a friend; he then rounded up the above group of young men. They had a plan to go to LaGrange and possibly rob someone there, but when the events unfolded in Carrollton, they decided to use the story that they went to LaGrange as an alibi.

As Coleman was driving at about 10:00 p.m., Potts made a telephone call, then he told Coleman to drive to the Elizabeth Village mobile home park in Carrollton. When they arrived, Potts said that they were looking for an older model, dark blue or black car, which they found almost immediately. All those in the white car, except Coleman, got out and shook hands with those sitting in the blue car. Coleman then got out, and someone from the white car said to Coleman, "Let me introduce you to my home boy." Coleman was introduced to Chade Ackey, Cody Buchanan, Marcus Oliphant, and "Boots," who he identified at trial as Randall Laye. He had never met Laye before that night.

Those from the white car got back in with Coleman at the wheel, and both cars drove to a different spot and reparked, perhaps 30 yards apart, facing out of Elizabeth Village. Everyone in the white car got out, and, although Coleman could not see well, he thought he saw three people get out of the blue car — Oliphant, Buchanan, and Laye. At this point, Coleman had a .38 caliber gun, and he helped Potts reload his nine millimeter gun, for which Laye was present. Coleman testified that Holland had a .32 caliber gun and Lytle had a .38 caliber gun. The heavily armed group then began to move through the neighborhood. At this point, Coleman had not seen Laye with a gun.

Coleman testified that he, Lytle, Shell, Holland, and Potts (the group from the white car) walked down the hill toward a mobile home with two SUVs parked out front. Oliphant and Buchanan did not follow; they remained "on top of the hill," but that was only a home or so away. Laye appeared wearing a mask, and he knocked on the mobile home door, but nobody answered. Pedro Espinoza, who was unknown to the group, then came out of the next home and sat on the trunk of his car smoking a cigarette. Coleman called everyone's attention, and he approached and asked Espinoza for a cigarette. Espinoza said he did not have any.

Coleman then saw Laye put a small gun, possibly a .22 or .25 caliber, to Espinoza's head and twice say, "Give up the money." Potts approached and began patting Espinoza down; Espinoza's cell phone fell out of his pocket; Potts picked it up; and Espinoza protested that he did not have any money. Potts then put his gun to Espinoza's mouth, and Holland kneed him in the groin, knocking him to the ground. Espinoza's brother appeared at the door of the home and asked what was going on; then his brother's wife asked what the group wanted. But once the woman closed the door, Potts started shooting, and Coleman and Laye followed suit; according to Coleman, however, Laye only shot in the air. They all then ran back to the cars. At the cars, someone, maybe Laye, asked for more bullets, and Lytle gave him some .22 or .25 caliber bullets.

At Potts's direction, Coleman then drove to a Kroger parking lot; there, another car approached, from which Ackey and Oliphant exited and got in the white car with Coleman and the others. Ackey asked repeatedly, "why did they shoot . . . why did the shooting start." The group then drove around and threw the .32 and the nine-millimeter out the window. The group eventually returned the car to the friend. Coleman did not testify about what happened to Laye or the blue car after the two cars left Elizabeth Village.

Evidence from other sources showed that when the shots were fired, Espinoza was wounded, his sister-in-law Paola Cabanas was hit inside the mobile home with a .38 caliber bullet from Coleman's

gun and killed, and one of three children in the home was shot through the legs as she sat on the couch watching television with her brother and sister. Espinoza's cell phone was found on the side of a road outside of Elizabeth Village.

1. In felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient; corroboration is necessary. See OCGA § 24-4-8. The corroborating evidence itself must connect the defendant with the crime or lead to an inference that he is guilty:

> To sustain a conviction in a felony case upon the testimony of an accomplice, there must be corroborating facts or circumstances, which, in themselves and independently of the testimony of the accomplice, directly connect the defendant with the crime, or lead to the inference that he is guilty. The necessary corroborating evidence may be circumstantial and it may be slight.

(Citations and punctuation omitted.) *Matthews v. State*, 284 Ga. 819-820 (1) (672 SE2d 633) (2009). The sufficiency of the corroborating evidence is a question for the trier of fact. Id.

Here, we need only find that the jury had sufficient corroborating evidence that Laye participated in an armed robbery, the only crime of which he was convicted; the indictment alleged that the defendants intended to and took Espinoza's cell phone by use of a handgun. Moreover, Laye may be convicted as a party to the crime if he was "concerned in the commission of [the] crime." OCGA § 16-2-20 (a). Subsection (b) (3) provides that a person is concerned in the commission of the crime if he or she "[i]ntentionally aids or abets in the commission of the crime." OCGA § 16-2-20 (b) (3). The jury was instructed on parties to a crime.

With regard to evidence corroborating Coleman's testimony, the State introduced two statements that Laye made to investigating officers on the two days following the shooting. The trial court found that the statements were freely and voluntarily given following proper *Miranda* procedures. The two statements corroborate the general events in Coleman's account, including placing Laye as the driver of the blue car, showing that Laye had heard Potts say that he was going to shoot somebody that night, and showing that Laye moved close enough to see the shooting; but Laye also stated that he was unarmed and that he did not go "down the hill" to the trailer and get involved with Espinoza or the shooting.

More specifically, Officer Steve Daniel testified that he spoke to Laye on July 20 and 21, 2006 and that both interviews were recorded. Laye's mother was present at the end of the first session

and for the entirety of the second. The recordings of the two interviews were played to the jury.

Laye's first interview was internally inconsistent with regard to his precise actions. He testified that he was 17 years old at the time; that he was driving the blue car; that he, Buchanan, and Oliphant were riding around when they got a call from Potts; that they drove to Elizabeth Village and met Potts, Holland, Shell, and Lytle, all of whom he knew, as well as a fifth person whom he did not know [Coleman], riding in a white Neon; that Laye and those in the blue car got out of the car; that he never got out of the blue car; that the two groups talked for about five minutes; that Potts said, "Before the night over, I'm going to shoot me somebody, boy."; that everybody in Potts's car had a gun; that Potts and his group "just started shooting"; that he heard gunshots before he got out of the car; that Potts's group "shot up the house"; and that when he heard the shots, he drove off. At one point, Laye's mother came in to the interview, and the officer left. Laye told his mother that he had told the police everything. Laye said to his mother, "I swear to God, me and Cody [Buchanan] didn't get out of the car."

In the second interview, this time with his mother present the entire time, Laye gave the following additional information: that he "wasn't really out of the car"; that he was not at the trailer when the others shot; and that he was "up the street" at that moment. At this point, Laye said, "I want a lawyer." From that point forward, Laye's mother questioned him. During this questioning, Laye said that he was "up the street" with Buchanan and Oliphant and that he was in the car. His mother said, "Look, you better start damn talking now. Did you get out of the car?" Laye answered, "Yes." But he added that he did not go to the trailer. His mother accused him of lying about not getting out of the car. Laye responded that he was out of the car only to talk to the other group. Then he said that he got out to see what the others were doing and that when the shooting started they ran. He said he was scared the previous day when he said he did not get out of the car.

The officer then said that Laye was not telling everything. He noted that he could not ask more questions because Laye had asked for a lawyer. But he added "So, you were there, I wasn't. You know what happened." Laye's mother continued, "you was there when they started shooting and everything." Laye responded "I took off running." He added that he only saw one person shoot, and it was the person he did not know in the other car, which would be Coleman. She then pressed her son with information she had heard from other people. She said that Shell "told everybody you had a gun, I asked you did you have a gun." Laye said that he did not have a gun. The officer continued to talk to Laye saying, that he was in big

trouble, "life-time trouble, . . . The ultimate charge, okay? . . . and you're going to catch an attitude with your mom." Laye's mother said that someone said that Laye "got to arguing with a white guy in Elizabeth Village, and [he] had a shoot-out with the white guy." Laye continued to plead that he did not have a gun.[1]

Thus, independent of the hearsay statements by his mother, Laye himself corroborated that he drove the blue car to Elizabeth Village; that someone in the car received a call from Potts from the other car; that he and the others got out of the blue car and talked to those from the white car, including Potts, for five minutes; that he — Laye — saw that Potts's group all had guns; that he heard Potts say that he was going to shoot somebody that night; that he moved far enough away from the blue car and toward the scene of the crime to see Coleman shoot; that he was close enough to the scene to need to "take off running" when the shooting started in order to get back to the blue car; and that he drove the blue car when the two cars left the scene. In addition, within and across both interviews, he gave inconsistent statements about whether he got out of the blue car, thereby impeaching his own credibility.

Additional evidence from other witnesses corroborated aspects of Coleman's story that further implicate Laye in the armed robbery. Immediately prior to the shooting, a person across the street from Espinoza's home saw a blue-grey car with tinted windows that looked like an Oldsmobile 98 drive through the neighborhood very slowly, four times without stopping. Another resident of Elizabeth Village saw a white car pull up directly in front of her house. After a blue car pulled up, four black males got out of the white car, and talked with those in the blue car for a minute or so. No one from the blue car got out, and after the conversation ended, both cars drove off toward the exit of Elizabeth Village; those who had gotten out of the white car were still out of the car, and she saw them walk toward the back of Elizabeth Village. After a short time, she heard gunshots. Also, .22 caliber bullets were found behind the back seat of the white car.

Finally, as a part of his testimony, Espinoza stated that at the same time one of the perpetrators asked for a cigarette, he saw another person trying the doors on the neighboring home; that he saw as few as three or as many as six persons during the attack, all of whom had part of their faces covered; that someone or all of them yelled "Give me the money, give me the money"; that after the

---

[1] Laye's attorney objected to the jury hearing any part of the second interview after Laye stated that he wanted an attorney. The trial court found that the officer did not ask any further questions about the facts of the case, and the court overruled the objection.

shooting, all of the attackers took off running; and that one guy came back to shoot him again.

Including these additional witnesses and independent of Coleman's testimony, the corroborative evidence strongly suggests that Laye drove the blue car to Elizabeth Village based on a call from Potts; that he drove the car as it cased the neighborhood; that thereafter, the two cars met up, and all but the driver of the white car got out to have a conversation with those in the blue car; that Laye heard Potts say he was going to shoot somebody; that four heavily armed members of the white car then began walking toward the back of Elizabeth Village toward the Espinoza home while Laye in the blue car and someone in the white car parked in a getaway position closer to the exit to Elizabeth Village; that Laye, Oliphant, and Buchanan then got out of the blue car and moved to within viewing distance of the scene of the crime, thereby explaining why Laye was not with Coleman's group on the initial approach to Espinoza's home; that at that point in time, Laye had cased the neighborhood, knew that there were guns and that Potts intended to shoot someone, yet he chose to move toward the scene of the crime rather than away; that, at a minimum, he watched the assault on Espinoza from just up the street; that he and the others ran back to the cars after the shooting; and that he drove one of the cars as they fled the scene.

This evidence was easily sufficient to independently and directly connect Laye to the crime and thereby corroborate Coleman's testimony that, at a minimum, Laye aided or abetted the armed robbery of Espinoza's cell phone. See, e.g., *Johnson v. State*, 288 Ga. 803, 805 (2) (708 SE2d 331) (2011). Although mere presence at the scene and merely driving a getaway car are insufficient standing alone,

> [i]f the defendant had knowledge of the intended crime and shared in the criminal intent of the principal actor, he is an aider and abettor. Hence, if the defendant was at the scene and did not disapprove or oppose the commission of the offense, a trier of fact may consider such conduct in connection with prior knowledge and would be authorized to conclude the defendant assented to the commission of the offense, that he lent his approval to it, thereby aiding and abetting the commission of the crime.

(Citation and punctuation omitted.) *Head v. State*, 261 Ga. App. 185, 187 (1) (582 SE2d 164) (2003).

2. Laye contends the trial court committed reversible error when it failed to give a limiting instruction regarding the admission of

co-defendant Ackey's custodial statement. Ackey did not testify at trial, and Laye contends the statement violated his right to confrontation and improperly corroborated Coleman's testimony about his participation in the crime, especially because the trial court failed to give a limiting instruction to the jury. He contends the statement violated the law set forth in *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968), *Richardson v. Marsh*, 481 U. S. 200 (107 SC 1702, 95 LE2d 176) (1987), and their progeny. The court denied the *Bruton* objection, finding that once each other's names were removed from Ackey's and Laye's statements, there was nothing incriminating vis-à-vis each other therein. Laye's counsel stated that a limiting instruction would be insufficient to remove the taint from the jury.

Ackey was interviewed on July 21, 2006, two days after the shooting, and he waived his *Miranda* rights. In his statement as redacted for trial, he stated the following: that he was 18 at the time of the events; that he, Oliphant, Buchanan, ***and a fourth person*** were in Buchanan's [blue] car riding in Elizabeth Village; that in the white car were Potts, Lytle, Shell, Holland, and Coleman; that he never knew Coleman before that night; that Oliphant spoke to Potts on the phone ***about fixing to rob somebody***; that he — Ackey — knew there was a plan "to do a lick" as they went to Elizabeth Village; that they parked the cars up the street; that when the two groups got together, Ackey's group said that they were "fixing to leave," but the other group said they ***were "fixing to rob somebody"***; that Oliphant gave his gun to Potts; that he — Ackey — stayed in the car and was not at the trailer where the shooting occurred; that ***he was the only one that stayed in the car***; that Oliphant and Buchanan got out of the car but "they didn't go down there. They went — they had stayed back."; ***that all three of the other boys in the car got out of the car and "walked down there"***; that "[Buchanan] and [Oliphant] ***and them, they*** went halfway. They didn't go all the way."; that "[Oliphant] ***and them, they*** went halfway. ***They*** didn't go on them folks property."; that by "halfway," he meant ***they were standing at the top of the street***; that he saw ***the others*** from his car "running back to the car. I said, 'What y'all running back to the car for?' And I heard them gunshots."; that he never saw any guns; that ***"someone —"*** got back in his car ***with a gun***; that, with regard to the gun Ackey said "I don't know what he did with it"; that those who got back in the car said "Them fools are crazy. They shot up the trailer."; that "they said they did all the shooting, them five right there."; that afterward, they went to pick up Laye's cousin, then went home; and that Potts was the ring leader of the group in the other car.

The Supreme Court has made clear that the Confrontation

Clause is violated by the admission of a nontestifying co-defendant's statement that implicates the defendant. *Bruton*, 391 U. S. at 135-137. This is true "even if the defendant's own confession is admitted against him." *Cruz v. New York*, 481 U. S. 186, 193 (107 SC 1714, 95 LE2d 162) (1987). And the violation generally cannot be remedied with a limiting instruction. *Bruton*, 391 U. S. at 137. In a joint trial, however, if the nontestifying co-defendant's statement is redacted to exclude "any reference to [the defendant or] his . . . existence," the statement may be admitted provided the jury is given an instruction limiting its use to the case against the co-defendant. *Richardson*, 481 U. S. at 211. But redaction must be thorough: the redaction is inadequate if it merely replaces a defendant's name with a blank space, the word "deleted," or a symbol, *Gray v. Maryland*, 523 U. S. 185 (118 SC 1151, 140 LE2d 294) (1998), or a reference to the defendant by nickname or by words such as "someone" or "others" or "they." *Hanifa v. State*, 269 Ga. 797, 804 (505 SE2d 731) (1998). There is a constitutional problem with "statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Gray*, 523 U. S. at 196.

Here, Ackey's statement identifies by name eight of the nine individuals accused with the crimes and refers to the ninth person as the "fourth person" in his car, as well as one of "all three of the other boys," as "he," as "them," and the "others." Because the jury was well aware who all the defendants were and which car they were in, it would be clear to the jury that the only unnamed person in Ackey's statement was Laye. And in the final line, Ackey even mentions picking up Laye's cousin. The clear implication of Ackey's statement was that Laye was the fourth person in the car; that all those in the car knew in advance that Oliphant and Potts planned to rob someone; that Laye, Oliphant, and Buchanan got out of the car and went halfway to the scene of the crime; that they could see the shooting; that the same three ran back to the car after the shooting; and that "someone," who could only be Buchanan or Laye, had a gun when he got back in the car.

Admission of Ackey's statement was therefore erroneous. See *Hanifa*, 269 Ga. at 803 (2) ("*Bruton* violation occurs [even] when testimony presented in a co-defendant's confession is supported by the defendant's own statement."); see, e.g., *Davis v. State*, 272 Ga. 327, 331 (6) (528 SE2d 800) (2000) (where redacted nontestifying co-defendant's statement said that "someone" shot the victim and the "someone" was immediately recognizable as the defendant, *Bruton* violation occurred). The statement directly implicates Laye as an accomplice to armed robbery. If Ackey's statement were the

sole evidence, the jury could easily infer that Laye knew in advance that there was a plan to rob someone and that therefore he knowingly functioned as a lookout or otherwise aided and abetted in the armed robbery. This is not a case where the co-defendant's statement does not incriminate the defendant on its face and is only incriminating when linked with other evidence. See, e.g., *Moss v. State*, 275 Ga. 96 (561 SE2d 382) (2002). Where a nontestifying co-defendant's statement directly implicates the defendant, a limiting instruction for the jury is inadequate. *Bruton*, 391 U. S. at 137; *Hanifa*, 269 Ga. at 803.

Because Laye's right to confrontation was violated he is entitled to a new trial unless the error was harmless. *Davis*, 272 Ga. at 332; *Hanifa*, 269 Ga. at 804 (2); *Schneble v. Florida*, 405 U. S. 427, 432 (92 SC 1056, 31 LE2d 340) (1972) ("unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required"). Our Supreme Court has explained that the test for harmless error depends on several factors:

> Whether a violation of the Confrontation Clause is harmless depends on a host of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Cits.]" *Delaware v. Van Arsdall*, 475 U. S. 673, 684 (106 SC 1431, 89 LE2d 674) (1986).

*Collum v. State*, 281 Ga. 719, 722 (2) (642 SE2d 640) (2007).

Here, most of Ackey's statement was almost entirely cumulative of Laye's own statement and testimony from other witnesses, and thus not that important. Ackey's statement corroborated only two pieces of information from Coleman's in-court testimony that were not corroborated by Laye or others: Ackey's statement confirms that those in the blue car knew in advance that a robbery was about to happen and it suggests that Laye had a gun. But we cannot overlook that Laye's own statements and others that show he drove the car to Elizabeth Village based on a call from Potts; that he drove around the neighborhood four times before Potts arrived; and that he followed on foot those he knew were armed toward Espinoza's home, went close enough to see the shooting, and drove one of the getaway cars, thereby strongly supporting his conviction for aiding and abetting the armed robbery. A defendant's confession "may be considered on appeal in assessing whether any Confrontation Clause

violation was harmless, see *Harrington v. California*, 395 U. S. 250 (89 SC 1726, 23 LE2d 284) (1969)." *Cruz*, 481 U. S. at 193-194. Thus, the State's case that Laye was a party to the armed robbery was almost undisputed. And the primary witness, Coleman, who was cross-examined, testified that Laye had an even greater role in the incident, yet Laye was acquitted of further involvement, showing that the jury distinguished which parts of Coleman's testimony to believe or which parts were corroborated. The jury did not even believe the portion of Ackey's statement (or Coleman's testimony, for that matter) suggesting that Laye had a gun; the jury acquitted Laye of gun possession. And although the prosecution argued at closing that Ackey's statement meant that Laye went farther toward the scene of the shooting than Oliphant and Buchanan, this too is largely cumulative of Laye's own statement that he was close enough to see the shooting. Considering all of these factors, we conclude "that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." (Punctuation omitted.) *Mason v. State*, 279 Ga. 636, 638 (2) (619 SE2d 621) (2005). See, e.g., *Collum*, 281 Ga. at 722 (2) (statements possibly violating *Bruton* were cumulative of other properly admitted evidence). Compare *Meadows v. State*, 264 Ga. App. 160, 166 (5) (590 SE2d 173) (2003) ("only evidence directly identifying [defendant] as one of the men at the victim's door was [co-defendant's] improperly admitted statement").

3. Given that any *Bruton* violation was harmless, we conclude that "[b]ecause [Laye] has failed to show that he was prejudiced by being tried jointly with [Ackey], the trial court did not abuse its discretion in denying his motion to sever." *Collum*, 281 Ga. at 722 (2). Compare *Gray*, 523 U. S. at 194-195 (because the use of an accomplice's confession "creates a special, and vital, need for cross-examination," a prosecutor desiring to offer such evidence must comply with *Bruton*, hold separate trials, use separate juries, or abandon the use of the confession). Although Laye contends his defense was antagonistic to Ackey's, the only real difference in their stories relative to aiding and abetting armed robbery was that Ackey stayed in the blue car and was not a get-away driver. And Laye essentially admits these differences.

4. Laye's contention that his conviction should be reversed because his trial counsel was ineffective for failing to ask for a limiting instruction regarding Ackey's statement is without merit, even when considering how the State's closing argument reinforced that Ackey's statement implicated Laye. Under *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), the appellant "must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. [Cit.]" *White v. State*,

283 Ga. 566, 569 (4) (662 SE2d 131) (2008). Laye's trial counsel testified at the hearing on the motion for new trial that failing to ask for a limiting instruction was a mistake on his part.

As we have already shown, no limiting instruction would have been sufficient under *Bruton*, and even the *Bruton* violation, for which counsel did object, was harmless error. Also, Coleman's testimony indicated that Laye was much more involved, yet the jury acquitted Laye on all other counts.[2] Thus, the jury either did not believe or found no corroboration of any greater involvement by Laye, including that Laye possessed a gun. We conclude that Laye cannot show that had a limiting instruction been given, the result of the trial would have been different; this is true even if counsel should have objected to the prosecutor's argument that Ackey's statement implicated Laye. See, e.g., *Bunkley v. State*, 278 Ga. App. 450, 454 (1) (a) (629 SE2d 112) (2006) (even if counsel's performance was deficient, defendant failed to show prejudice). As shown above, Laye's own statements were all that was needed to convict him of aiding and abetting an armed robbery. Accordingly, Laye cannot show the second prong of a claim of ineffective assistance: that there is a reasonable probability that the outcome of the trial would have been different absent the failures.

5. Laye also urges that his trial counsel was ineffective for failing to object to the hearsay found in his mother's statements that she made when Laye was interrogated on July 21, 2006. As shown above, that hearsay included that one accomplice "told everybody you had a gun," and that someone said that Laye "had a shoot-out with the white guy." Although trial counsel objected on other grounds, he did not raise hearsay as a ground. Trial counsel admitted at the hearing on the motion for new trial that he should have objected on that ground. We agree. The only possible corroboration of Coleman's testimony that Laye had a gun came from Ackey's statement, which cannot be used against Laye, and from Laye's mother's hearsay. Whether Laye had a gun was a material contested point and to allow hearsay to that effect was deficient performance.

But again, Laye's own testimony was sufficient to show that he was a party to armed robbery even if he did not have a gun. And he was acquitted of murder, multiple counts of aggravated assault and cruelty to children, and even possession of a gun during the commis-

---

[2] "This circumstance strongly supports the conclusion that the assistance actually rendered by defendant's trial counsel fell within that broad range of reasonably effective assistance which members of the bar in good standing are presumed to render." (Citations omitted.) *Green v. State*, 218 Ga. App. 648, 651 (3) (a) (463 SE2d 133) (1995). *Powell v. State*, 272 Ga. App. 628, 630 (612 SE2d 916) (2005).

sion of a crime and possession of a pistol or revolver by a person under the age of 18. The jury clearly decided that there was insufficient evidence to convict Laye of these other crimes, including aggravated assault on Espinoza and possession of a gun. And this occurred despite the fact that the jury was charged that a person can be convicted of possession of a gun based on actual possession, joint possession, or constructive possession. Accordingly, Laye cannot show that absent the improper hearsay evidence suggesting that he had a gun, the outcome of the trial would have been different. Our conclusion is not altered even when considering the combined effects of trial counsel's errors. See *Schofield v. Holsey*, 281 Ga. 809, 812, n. 1 (642 SE2d 56) (2007).

6. Finally, Laye contends the trial court erred by not giving him an opportunity to object to the substitution of his original counsel and erred by allowing the substitution to occur.

Laye was initially represented by Allen Trapp, a private attorney appointed by the regional office of the Georgia Public Defender Standards Council (the "Council"). On January 30, 2007 (a little over six months after the crimes), the trial court signed an order substituting counsel for five of the defendants, including Laye and co-defendant Buchanan; the order had been prepared by the Council and it was signed ex parte by the judge. Laye's new counsel filed an entry of appearance the next day. Nevertheless, on March 28, 2007, the Council filed a motion — largely redundant of the earlier order — to substitute trial counsel for four of the same five defendants, including Laye's counsel but not Buchanan's, as if the earlier order had not been effective. The motion asserted the ground that the Council did not have sufficient funds to pay for private counsel for these defendants.[3] The motion indicated that current counsel had been advised and had agreed to the substitution and that the defendants had not objected. One day later the motion was granted, and the four defendants were assigned public defenders from around the state.

At the hearing on the motion for new trial, both Laye and his original counsel testified that they thought they had no choice at the time. The court itself stated that it thought that it had no authority to deny the motion and no authority to order that Laye's initial counsel be paid. But counsel for co-defendant Buchanan did object, apparently between the time of the ex parte order and the subsequent motion as he was not named in the March motion, and he continued to represent Buchanan. Laye's second attorney was eventually replaced as well, but his third attorney had upwards of one

---

[3] The legislature apparently had cut the budget for the Council, including the funds available to hire conflict counsel.

year to prepare for trial. That attorney filed motions to sever, to change venue and other motions, and he is at least partially responsible for obtaining an acquittal on all but one count for Laye. Finally, each defendant was given the right to have his own investigator, separate from the other defendants.

"[A] defendant who does not require appointed counsel [has the right] to choose who will represent him. [Cits.]" *United States v. Gonzalez-Lopez*, 548 U. S. 140, 144 (126 SC 2557, 165 LE2d 409) (2006). For indigent defendants, however, that right is circumscribed: "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." Id. at 150-51, citing *Wheat v. United States*, 486 U. S. 153, 159 (108 SC 1692, 100 LE2d 140) (1988).[4] Nevertheless, our Supreme Court has held that when an indigent defendant's choice of counsel "is supported by objective considerations favoring the appointment of the preferred counsel, and there are no countervailing considerations of comparable weight" it is an abuse of the trial court's discretion not to honor the request. *Chapel v. State*, 264 Ga. 267, 268 (2) (443 SE2d 271) (1994). Even so, an indigent defendant's preference for certain counsel may be waived by action or declaration. *Johnson v. State*, 139 Ga. App. 829, 831 (1) (229 SE2d 772) (1976).

We conclude that Laye has not shown reversible error for several reasons. First, he waived any objection to a change in counsel. His contention that the trial court gave him no opportunity to object is belied by the fact that another defendant did object and thereby retained his original counsel. No explanation has been given for why Laye's counsel could not also have objected. The motion to substitute counsel was served on counsel for Laye and it included the statement that counsel had been advised and had agreed to the substitution and that the defendants had not objected. Thus, Laye and his original counsel were on notice that the substitution was based on their failure to object. At that point, they had an obligation to speak up and correct any misinformation. This they did not do. Despite the confusion possibly caused by the ex parte order, Laye, through counsel, had an opportunity to set the record straight; but he failed to do so.

Second, there was a countervailing consideration presented to the court: that the Council was unable to pay for private attorneys and therefore a public defender was necessary. The trial court did not abuse its discretion by considering this factor.

---

[4] See also *Caplin & Drysdale, Chartered v. United States*, 491 U. S. 617, 624 (109 SC 2646, 105 LE2d 528) (1989) ("those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts"); *Jackson v. State*, 252 Ga. App. 157, 158 (555 SE2d 835) (2001) (indigent defendant entitled to reasonably effective assistance of counsel, not counsel of his own choosing).

Finally, as shown above, Laye has not shown reversible ineffective assistance of counsel. Despite the two errors mentioned above, it is apparent that Laye's trial counsel adequately represented him. As already stated, Laye was acquitted on all other counts save armed robbery, despite Coleman's testimony that he had a gun, pointed it at Espinoza, and shot it. See *Green*, 218 Ga. App. at 651 (3) (a). Compare *Gonzalez-Lopez*, 548 U. S. at 146 (deprivation of right to counsel of a nonindigent defendant does not require a showing of prejudice).

*Judgment affirmed. Barnes, P. J., and Blackwell, J., concur.*

DECIDED NOVEMBER 15, 2011 —
RECONSIDERATION DENIED NOVEMBER 28, 2011 — 

*James D. Lamb*, for appellant.

*Peter J. Skandalakis, District Attorney, Anne C. Allen, Assistant District Attorney*, for appellee.