**THIRD DIVISION
BARNES, P. J.,
BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 30, 2015**

# In the Court of Appeals of Georgia

A14A2350. POTTS v. THE STATE.

BRANCH, Judge.

Aerius Deshad Potts was tried by a Carroll County jury and convicted of seven counts of aggravated assault,[1] three counts of felony cruelty to children,[2] one count of armed robbery,[3] one count of possession of a firearm during the commission of a crime,[4] and one count of possession of a pistol or revolver by a person under 18 years of age.[5] He now appeals from the denial of his motion for a new trial, asserting that

---

[1] OCGA § 16-5-21.

[2] OCGA § 16-5-70 (b).

[3] OCGA § 16-8-41.

[4] OCGA § 16-11-106.

[5] OCGA § 16-11-132.

the trial court erred in charging the jury and in failing to merge two of the aggravated assault convictions with the armed robbery conviction. We find no error in the trial court's jury charge and therefore affirm the denial of Potts's motion for a new trial. We further find, however, that the trial court erred in failing to merge two of Potts's aggravated assault convictions (Counts 5 and 11) with his conviction for armed robbery (Count 4). We therefore vacate Potts's convictions as to Counts 5 and 11 and remand the case so that Potts may be re-sentenced.

On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict. *Martinez v. State*, 306 Ga. App. 512, 514 (702 SE2d 747) (2010). So viewed, the record shows that on the evening of July 19, 2006, Pedro Espinoza was robbed at gunpoint, beaten, and shot while outside of his residence in the Elizabeth Village mobile home park in Carrollton. Inside the residence were Espinoza's brother, Jorge Espinoza; Jorge's wife, Paola Cabanas; and three children that Paola was babysitting: Sabrina, Pablo, and Valerie Monsivais. When Jorge opened the door of the mobile home to see what was happening to his brother, one of the assailants pointed his gun at Jorge. Jorge immediately closed the door and at least two assailants then began shooting at the trailer. Jorge suffered a

gunshot wound to his arm and Paola was struck and killed by one of the bullets shot into the home. Another bullet struck Sabrina Monsivais, injuring the child in both legs.

After police investigated the incident, Potts and eight other young men were arrested and indicted for malice murder, felony murder, armed robbery, aggravated assault (eight counts), felony cruelty to children (three counts), possession of a knife or gun during the commission of a crime, and possession of a pistol or revolver by a person under the age of 18.[6] Potts was tried separately from his co-indictees, and the evidence presented at his trial included the testimony of two of those co-indictees, Christopher Coleman[7] and Chade Ackey.[8] Coleman testified that on the evening of July 19, 2006, he, together with Potts and co-indictees LaBryan Lytle, Varion "Snoopy" Shell, and Arlandra Deonte "Red" Holland, made a plan to rob someone. To that end, Coleman borrowed a white Dodge Neon from a friend so that he could

---

[6] The nine young men were also charged with theft by receiving stolen property, but the State elected not to prosecute that count of the indictment.

[7] Prior to his trial, Coleman pled guilty to the charges of felony murder, armed robbery, multiple counts of aggravated assault, multiple counts of cruelty to children, and possession of a firearm by a convicted felon. He is currently serving a sentence of life plus ten years.

[8] Following a jury trial, Ackey was acquitted of all charges.

3

drive the others. The original plan had been to travel to LaGrange to commit the robbery. As the group was driving around Carrollton, however, Potts made a phone call. After the call, Potts directed Coleman, who was not from Carrollton, to Elizabeth Village.

At the mobile home park, the group in the white car met Ackey, Cody Buchanan, Marcus Oliphant, and Randall "Boots" Laye, who were riding in a blue Oldsmobile. The two cars then moved to a different location in Elizabeth Village, closer to the exit. Potts obtained a nine millimeter pistol from one of the men in the blue car, and Coleman helped Potts load the gun with ammunition. Coleman testified that he, Lytle, Shell, Holland, and Potts (the group from the white car), together with Laye, walked toward a mobile home with two SUVs parked out front; Oliphant and Buchanan walked behind this group. Laye knocked several times on the door of the target mobile home, but got no response. As Laye was knocking, Pedro Espinoza came out of the neighboring home, leaned against the trunk of his car, and began smoking a cigarette. Coleman approached Pedro and asked him for a cigarette and Espinoza responded that he had no more cigarettes.

Laye approached Pedro, put a gun to Pedro's head, and demanded money. Potts then moved toward Pedro, and when Pedro stated that he had no money, Potts placed

4

his gun in Pedro's mouth and Holland kneed Pedro in the groin, knocking him to the ground. At some point during this encounter, Potts took Pedro's cell phone from him. Both Jorge and Paola came to the door of the home at different times during the attack on Pedro and asked what was going on. After the trailer door was opened and closed a second time, Potts started shooting, and Coleman followed suit.[9] Coleman, Potts, and their companions then fled back to their cars and drove away from Elizabeth Village.

Later that evening, Coleman drove Oliphant, Potts, and Ackey to a rural area, where Potts disposed of the gun he had used, together with a second gun used in the crimes, by tossing them out of the car window. Investigators eventually recovered both of these guns, as well as a .380 caliber semi-automatic handgun which Coleman admitted to using in the crimes. Four cartridge cases and a bullet found at the scene, as well as the bullet recovered from Paola's body, were matched by ballistics experts to the nine millimeter pistol used by Potts and to Coleman's .380 caliber gun.

---

[9] Pedro testified that Paola was the first to come to the door and Jorge was the second, and that the shooting began immediately after Jorge closed the trailer door. Coleman testified that Jorge came to the door first and Paola came second, and that the shooting began immediately after Paola closed the trailer door.

Ackey testified that on the evening in question he, Oliphant, and Buchanan were riding in a blue Oldsmobile driven by Randall Laye. Potts called Ackey's cell phone and Ackey immediately handed the phone to Oliphant, explaining that he did not want to talk to Potts because he viewed Potts as "unpredictable crazy." After Oliphant spoke with Potts, Laye drove the car to Elizabeth Village, where Ackey and his companions met up with Potts and his companions. All of the young men riding in the white car exited their vehicle and walked over to the blue Oldsmobile. Once at the blue car, Potts asked Oliphant about a gun, and Oliphant handed him a nine millimeter pistol. According to Ackey, at that point "the talk was about fixing to rob somebody." Ackey then saw all five occupants of the white car, including Potts, together with the three men with whom Ackey had been riding, walk down a hill in the direction of some mobile homes. Ackey, however, remained in the car because he did not want to participate in the robbery. According to Ackey, about five of the eight men who walked towards the mobile homes had guns.

Shortly after his companions walked away from the cars, Ackey heard gunfire and all of the young men came running back towards the cars; everyone got back into the car in which they had come and both cars fled the scene. Sometime later that night, Ackey and Oliphant met the white car in the parking lot of a Kroger store and

6

joined the five men therein. The group then drove around the area for a while and as they did so, "some guns" were thrown out of the car.

The prosecution also introduced the taped police interview of Potts's co-indictee Randall Laye.[10] This Court previously affirmed Laye's convictions under the indictment at issue. See *Laye v. State*, 312 Ga. App. 862 (720 SE2d 233) (2011). In doing so, we summarized the relevant portion of Laye's custodial statement as follows:

> [Laye told police] that he was driving the blue car; that he, Buchanan, and Oliphant were riding around when they got a call from Potts; that they drove to Elizabeth Village and met Potts, Holland, Shell, and Lytle, all of whom he knew, as well as a fifth person whom he did not know [Coleman], riding in a white Neon; that Laye and those in the blue car got out of the car; that he never got out of the blue car; that the two groups talked for about five minutes; that Potts said, "Before the night over, I'm going to shoot me somebody, boy"; that everybody in Potts's car had a gun; that Potts and his group "just started shooting"; that he heard gunshots before he got out of the car; that Potts's group "shot up the house"; and that when he heard the shots, he drove off.

*Laye*, 312 Ga. App. at 865.

_____

[10] Laye was called to testify at trial. Although Laye had already been tried and convicted for the charged crimes and although the State offered him immunity from any further prosecution, Laye refused to testify.

7

The State also introduced a video recording of Potts's police interview. During that interview, Potts admitted to riding in the white Dodge Neon on the night in question, but he initially insisted that the group had driven to LaGrange to meet some girls. Later in the interview, Potts stated that he, Holland, Shell, and Lytle had gotten in the white Neon with Coleman believing they were going to LaGrange. Instead, however, Coleman drove the group to Elizabeth Village. Once at Elizabeth Village, Potts and his companions all exited their car and met with the four men riding in the blue car; although Potts recognized the four men, he claimed he did not know them. At some point while they were in Elizabeth Village, Coleman began shooting, at which point Potts, Holland and Lytle ran back to the car. Potts stated that Coleman was carrying a .380 pistol and that Coleman did all the shooting. At one point in the interview, Potts stated that Coleman's gun was the only one Potts saw. Later in the interview, however, Potts indicated that Lytle also had a gun. And although Potts claimed to have stood at a distance throughout the incident, his statement showed that he was close enough to the trailer to observe that one or more persons had come to the door of the mobile home and that the shooting did not start until after Potts's companions thought they might have been seen.

8

In keeping with his statement to police, Potts's defense at trial was that he was merely present at the scene of the crime. In support of this defense, he presented the testimony of Derricus Phillips, an inmate at the Carroll County Jail who had spent several months as a cell mate of Coleman. Phillips testified that during the time they shared a cell, Coleman told Phillips that he believed Potts was the reason Coleman "got caught." Coleman explained that Potts had detailed knowledge of the robbery and shooting only because Coleman told Potts what had occurred at and around the Espinoza residence. Coleman also reportedly told Phillips that of the nine men involved in the incident, three of them (Ackey, Buchanan, and Potts) "didn't do nothing" and Coleman planned to testify to that fact. Coleman changed his mind as to Potts, however, because he learned that Potts's brother was a police officer and Coleman therefore believed that Potts had provided information to his brother that led to Coleman's arrest.

At the charge conference, the trial court stated that in addition to the charge on parties to the crime, it was going to give the pattern charges on knowledge, mere presence, and mere association. The court further explained that it was going to incorporate additional language proposed by the State into the pattern charges on knowledge and mere presence. Defense counsel objected to the additional language,

arguing that it was not supported by the evidence. The trial court overruled these objections. Following the charge to the jury, defense counsel reiterated her objection to the charges given on knowledge and mere presence.

During its deliberations, the jury requested to be recharged on party to a crime,[11] aiding and abetting, felony murder, and malice murder. After conferring with counsel, and again over the objection of defense counsel, the trial court recharged the jury as it had requested. The jury returned a verdict of not guilty as to the charges of felony murder, malice murder, and the aggravated assault charge that resulted from the shooting of Pedro Espinoza, but found Potts guilty of all remaining charges. Following a sentencing hearing, the trial court sentenced Potts to life on the armed robbery count. The court also sentenced Potts to 20 years on each of the seven counts

---

[11] As to parties to a crime, the trial court charged the jury as follows: Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of the commission of the crime. A person is concerned in the commission of a crime only if he, one, directly commits the crime, or, two, intentionally causes some other person to commit the crime under circumstances that the other person is not guilty of any crime, either in fact or because of legal incapacity, or, three, intentionally aides or abets in the commission of the crime, or, four, intentionally advises, encourages, hires, counsels or procures another to commit the crime.

of aggravated assault, 20 years on each of the three counts of felony cruelty to children, 15 years on the count of possession of a firearm during the commission of a crime, and 12 months on the count of possession of a pistol or revolver by a person under the age of 18. The trial court imposed all of these sentences to be served consecutively to the life sentence and to one another. Thus, Potts, who was 15 years old at the time of the charged crimes, received a total sentence of life plus 206 years.

Potts was tried in February 2008 and sentenced in March of that year. He filed a motion for a new trial in April 2008, and subsequently amended that motion twice, once in March and once in June of 2013. The trial court entered an order denying the new trial motion in January 2014, and in May 2014 the trial court granted Potts's motion for leave to file an out-of-time appeal. This appeal followed.

1. The trial court supplemented the pattern jury charges on knowledge and mere presence with language that the court found was appropriate based on the evidence presented at trial. With respect to these two points of law, the trial court instructed the jury as follows:

> Knowledge on the part of the Defendant that any of these crimes were being committed and that the Defendant knowingly and intentionally participated in or helped in the commission of such crimes must be proved by the State beyond a reasonable doubt. If you find from the

11

evidence in this case that the Defendant had no knowledge that these crimes were being committed, or that the defendant did not knowingly and intentionally commit, participate or help in the commission of these alleged offenses, then it would be your duty to acquit the Defendant. On the other hand, should you find beyond a reasonable doubt that the Defendant had knowledge that the crimes charged were being committed and the Defendant knowingly and intentionally participated or helped in the commission of them, then it would be — you would be authorized to convict the Defendant. *If a person had knowledge of the intended crime and shared in the criminal intent of the principle actor, he is an aider and abettor. Hence, the defendant -- if the defendant was at the scene and did not disapprove or oppose the commission of the offense, a trier of fact may consider such conduct in connection with prior knowledge and would be authorized to conclude that the Defendant assented to the commission of the offense, that he lent his approval to it, thereby aiding and abetting commission of the crime.*

Ladies and gentlemen, a jury is not authorized to find a person who was merely present at the scene of the commission of a crime at the time of its perpetration guilty of consent in or concurrence in the commission of the crime unless the evidence shows beyond a reasonable doubt that such person committed the alleged crime, helped in the actual perpetration of the crime or participated in the criminal endeavor. . . . *Mere presence at the scene of a crime is insufficient to convict one of being a party to the crime, but presence, companionship and conduct before and after the offense are circumstances for which one's participation in the criminal intent may be inferred.*

12

The language italicized above is not found in the pattern jury charges on knowledge and mere presence, and it is this language to which Potts objected. In his brief, Potts offers three arguments as to why these "expanded" jury charges constitute reversible error. First, Potts appears to contend that a presumption of prejudicial error arises whenever a trial court deviates from the pattern instructions and that this presumption is strongest when the trial court "expands" the pattern instructions by supplementing them with additional language. It is well-established, however, that "jury instructions do not need to track, exactly, the language of pattern jury instructions." *Watkins v. State*, 265 Ga. App. 54, 54 (1) (592 SE2d 868) (2004) (footnote omitted). Rather, the law simply requires that the jury charge, when viewed as a whole, fully and accurately explains to the jury the law they are to apply. Id. See also *Sharpe v. State*, 272 Ga. 684, 689 (6) (531 SE2d 84) (2000) (no reversible error exists where, when "[c]onsidered as a whole, the trial court's charge fully and adequately informed the jurors of the correct legal principles" applicable to the case) (citation omitted); *Hickey v. State*, 325 Ga. App. 496, 499 (2) (753 SE2d 143) (2013) ("this Court views jury charges as a whole in determining whether the jury was fully and fairly instructed on the law of the case") (citation omitted). Additionally, jury

13

charges "must be tailored to the indictment and adjusted to the evidence admitted." *Carter v. State*, 224 Ga. App. 445, 448-449 (481 SE2d 238) (1997) (citations omitted). And the charge must be clear — i.e., it must be worded in such a way that it does not confuse or mislead the jury. *Watkins*, 265 Ga. App. at 54 (1). See also *Garmon v. State*, 269 Ga. App. 795, 799 (2) (605 SE2d 606) (2004).

In this case, the additional language incorporated into the trial court's charge on knowledge is a correct statement of the law that has been approved by this Court on a number of occasions. See *Rinks v. State*, 313 Ga. App. 37, 38 (718 SE2d 359) (2011); *Carter*, 224 Ga. App. at 447 (1); *McWhorter v. State*, 198 Ga. App. 493, 493 (1) (402 SE2d 60) (1991). In *Carter*, we expressly approved a jury charge which had employed this language, explaining that the charge provided the jury with "an axiomatic principle of law in the area of aiding and abetting." 224 Ga. App. at 448 (1). Similarly, both the Georgia Supreme Court and this Court have approved the additional language incorporated into the trial court's charge on mere presence. See *White v. State*, 278 Ga. 499, 500 (1) (604 SE2d 159) (2004) (citation and punctuation omitted); *McKenzie v. State*, 283 Ga. App. 555, 558 (642 SE2d 187) (2007) (citation and punctuation omitted). Accordingly, that charge also represented an accurate

statement of the law. And we find that the additional language the trial court incorporated into these charges was warranted.

As noted above, Potts's theory of defense was that he was merely present at the scene of the crime and that he had no knowledge Coleman was driving him to Elizabeth Village or that Coleman planned to commit a robbery on the night in question. In response to this defense, the State presented evidence showing that even if Potts did not commit directly the armed robbery, aggravated assaults, and acts of cruelty to children at issue, he was at least a party to those crimes. Specifically, the State presented evidence showing that, at the very least, Potts aided and abetted the commission of these crimes. See OCGA § 16-2-20 (b) (3) (defining a party to a crime as one who aids and abets the commission of the crime). Thus, in light of the evidence presented by the State, the trial court correctly charged the jury on aiding and abetting as part of its charge on knowledge.

The State's evidence also disputed Potts's claim that he was merely present at the scene of the crime and had no prior knowledge the robbery was going to occur. The evidence showed that Potts went with Coleman on the night in question for the purpose of committing a robbery; that Potts spoke with Oliphant (in the blue car) and they arranged to meet at Elizabeth Village; that Potts then directed Coleman to

15

Elizabeth Village; that Potts fled the scene with Coleman and the others; and that Potts later helped to dispose of one or more guns used in the crimes. This evidence warranted the additional law incorporated into the pattern charge on mere presence, that "presence, companionship and conduct before and after the offense are circumstances for which one's participation in the criminal intent may be inferred." Thus, given Potts's theory of defense and the evidence presented by the State, the jury charges at issue were appropriate.

Potts further contends that the "expanded charges placed undue emphasis on the 'parties to a crime' charge and likely" confused the jury. As evidence of the jury's "likely" confusion, Potts points to the jury's request to be recharged on party to a crime, aiding and abetting, felony murder, and malice murder. Notably, however, following this recharge the jury acquitted Potts of the two most serious charges he was facing: malice murder and felony murder. It also acquitted Potts of the aggravated assault charge resulting from the shooting of Pedro. More importantly, Potts fails to offer any legal authority to support the proposition that a request to recharge, standing alone, evidences confusion on the part of the jury. And, as noted above, the mere fact that the language of the charge deviated from that found in the pattern charge, without more, is insufficient to show that the charge was likely to

16

confuse the jury. See *Watkins*, 265 Ga. App. at 54 (1). Given this fact, and given that the charges represented a clear and accurate statement of the applicable law and were tailored to the evidence presented, we find nothing in the charge as a whole that could have resulted in jury confusion. See *Marriott v. State*, 320 Ga. App. 58, 64 (2) (b) (739 SE2d 68) (2013) ("[t]o determine whether a jury charge is likely to have misled or confused the jury about the elements of a particular crime, we must consider the charge as a whole, reading all of its parts in conjunction with each other") (citations omitted).

Finally, Potts contends that the charges on knowledge and mere presence conflicted with the trial court's instruction on mere association. With respect to mere association, the trial court instructed the jury:

> Likewise, a jury is not authorized to find a person who was merely associated with other persons involved in the commission of a crime guilty of consent in or concurrence in the commission of the crime unless the evidence shows beyond a reasonable doubt that such person helped in the actual perpetration of the crime or participated in the criminal endeavor.

Potts contends this charge conflicts with the additional language the trial court incorporated into the pattern charges on knowledge and mere presence because the

mere association charge "requires the jury to find an 'actual perpetration of the crime,' or proof that [Potts] 'participated in the criminal endeavor.'" Potts, however, offers no explanation as to how or why this part of the mere association charge conflicts with the additional language incorporated into the charges on knowledge and mere presence. And reading the charges together, we find no conflict between the language requiring proof of "actual perpetration of the crime" or participation "in the criminal endeavor" (the mere association charge) with the language requiring proof of "the commission of the offense" (the knowledge charge). Nor do we find any conflict between the above-referenced language from the mere association charge and the additional language incorporated into the charge on mere presence, which refers to proof of "presence, companionship and conduct *before and after the crime*." (Emphasis supplied).

In light of the foregoing, and considering the jury charge as a whole, we find no error in the trial court's jury instructions. The charge fully and adequately informed the jurors of the correct legal principles concerning parties to a crime, knowledge, mere presence, and mere association.

2. Potts and his companions were indicted on four separate counts as to their actions towards Pedro Espinoza: Count 4 charged armed robbery; Count 5 charged

the commission of aggravated assault by placing a handgun in Pedro's mouth; Count 6 charged the commission of aggravated assault by shooting Pedro with a handgun; and Count 11 charged the commission of aggravated assault with intent to rob by pointing a handgun at Pedro and demanding money. The jury acquitted Potts on Count 6 but found him guilty of the three remaining counts. The trial court then convicted and sentenced Potts on Counts 4, 5, and 11. On appeal, Potts asserts that the trial court erred in failing to merge the two aggravated assault counts (Counts 5 and 11) with the count of armed robbery (Count 4). We agree.

As the State concedes in its brief, the Georgia Supreme Court has already decided this issue in Potts's favor. See *Oliphant v. State*, 295 Ga. 597, 602 (4) (b) (759 SE2d 821) (2014). In *Oliphant*, one of Potts's co-indictees argued on appeal that the trial court had erred in failing to merge his convictions on the same Counts 5 and 11 of the indictment with his conviction on the same Count 4. The Supreme Court agreed, explaining:

> Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. (Citation and punctuation omitted.) *Drinkard v. Walker,* 281 Ga. 211, 215 (636 SE2d 530) (2006). Under this test, the conviction on Count 11, aggravated assault with intent to rob, clearly should have merged into the armed robbery conviction. See

19

*Lucky v. State,* 286 Ga. at 481-482 (689 SE2d 825) (comparing elements of armed robbery with those of aggravated assault with intent to rob and concluding that the latter was a lesser included offense of the former). As to Count 5, the same result obtains, because the aggravated assault with a deadly weapon as alleged here (i.e., by putting a gun in Pedro's mouth) does not require proof of any fact in addition to those necessary to prove the armed robbery. See *Bradley v. State,* 292 Ga. 607 (1) (c) (740 SE2d 100) (2013); *Long v. State,* 287 Ga. 886 (2) (700 SE2d 399) (2010).

Id.

Applying *Oliphant* to the instant case, Potts's convictions and sentences on Counts 5 and 11 of the indictment are vacated and the case is remanded so that Potts may be resentenced. Potts's remaining convictions are affirmed, as is the trial court's order denying Potts's motion for a new trial.

*Judgment affirmed in part, vacated in part, and case remanded with direction.*

*Barnes, P. J., and Boggs, J., concur.*

20